**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **JOHN DOE,**<br>**c/o**<br>    Louise A. Herman, Esq.<br>    Herman Law Group<br>    1445 Wampanoag Trail, Suite 104<br>    East Providence, RI 02915<br><br>                    *Plaintiff,*<br><br>v.<br><br>**ROMAN CATHOLIC BISHOP OF PROVIDENCE, A CORPORATION SOLE,**<br>    SERVE ON:<br>    Eugene G. Bernardo, II., Esq., Res. Agent<br>    One Cathedral Square<br>    Providence, RI  02903<br><br>and<br><br>**SAINT MATTHEW'S CHURCH OF CENTRAL FALLS,**<br>    SERVE ON:<br>     Rev. Otoniel Gomez, Res. Agent<br>     Holy Spirit Catholic Community<br>     1030 Dexter Street<br>     Central Falls, RI  02863<br><br>                    *Defendants*. | **JURY TRIAL DEMANDED**<br><br>**Case No.** |

**COMPLAINT & DEMAND FOR JURY TRIAL**

Plaintiff John Doe ("Plaintiff"), by and through his undersigned attorneys, for his causes of action against the Roman Catholic Bishop of Providence, a Corporation Sole d/b/a Diocese of Providence ("DOP" or the "Diocese") and Saint Matthew's Church of Central Falls ("St. Matthew's") (Collectively "Defendants"), alleges upon personal knowledge and, where stated, upon information and belief, as follows:

1

## NATURE OF THE ACTION

1.      After many decades of waiting for justice and accountability, the courtroom doors have finally opened to Plaintiff. In June 2026, the Rhode Island General Assembly amended Rhode Island General laws § 9-1-51, to create a two-year revival window for survivors of child sexual abuse whose statute of limitations had previously expired. The Act took effect on July 1, 2026, enabling survivors like Plaintiff to seek long overdue justice.

2.      From approximately 1980 through at least 1981, Rev. Roland Lepire sexually abused Plaintiff, who was just a child. Predictably, Plaintiff suffered severe emotional trauma that has impacted every aspect of his life in the ensuing decades.

3.      Fr. Lepire preyed upon Plaintiff and other young children of the parish as part of a wider pattern of serialized child sexual abuse which the DOP knew or reasonably should have known of and even helped hide.

4.      The Diocese has a long history of prioritizing its own institutional protection over the safety of the children attending its parishes, schools, and other institutions it controls throughout Rhode Island. In March 2026, the Rhode Island Attorney General released a 284-page report detailing the findings of a six-year investigation into the Diocese, identifying 75 clergy members with credible allegations of sexual abuse of more than 300 victims spanning over six decades. The report conclusively found that the DOP systematically concealed abusive clergy from the public and law enforcement, transferred known abusers to new assignments without disclosing their histories, and failed to report abuse to civil authorities.

5.     The DOP and its institutions harbored abusers, ignored red flags, and failed to institute basic safeguards to keep the children with whose care they were entrusted safe from the abuse they knew or should have known to be occurring at Catholic institutions throughout the state.

6.     By this suit, Plaintiff seeks to hold accountable those who abused him and those who enabled that abuse by seeking monetary damages and any other relief to which he is legally entitled.

**PARTIES**

7.     Plaintiff John Doe is an adult individual and resident of Georgia, who, at all relevant times, resided in Rhode Island and was a minor at the time of all sexual abuse, assault, exploitation, and neglect alleged herein.

8.     Defendant DOP is a non-profit corporation organized and existing under the laws of Rhode Island that maintains its principal place of business at One Cathedral Square, Providence, Rhode Island 02903.

9.     At all relevant times, the DOP conducted business in Rhode Island.

10.    The Diocese was established in 1872 and currently encompasses all Roman Catholic parishes, schools, missions, and affiliated institutions operating within the geographic boundaries of Rhode Island.

11.    The DOP was created through the Rhode Island General Assembly during the January session of 1900 and became effective on May 4, 1900.

12.    The DOP is a corporate entity through which the Diocese and its agencies conduct the religious and other affairs of the Diocese under the supervision of and at the direction of the Bishop.

13.    The DOP has ultimate control over hiring, training, supervising agents, servants, and employees of the Diocese of Providence, and owns and manages land, parishes, schools, and other affiliated entities throughout Rhode Island.

14.    The DOP has ultimate control over activities on properties within its jurisdiction, including Catholic schools and parish properties within its geographic boundaries.

15.    The DOP has authority and responsibility for hiring, training, educating, ordaining, and placing clergy and other employees, agents, and volunteers within its jurisdiction. The DOP is responsible for monitoring and investigating the moral, ethical, psychological, education, and emotional fitness of candidates for the priesthood, ordained priest, and any other servant of the Diocese during their ministry and/or tenure.

16.    The DOP is responsible for supervising, investigating, discipling, removing, recommending for laicization, and reporting to civil authorities any clergy ordained within and transferred to its jurisdiction.

17.    The DOP is responsible for investigating and responding to reports of sexual abuse at institutions within its jurisdiction, including reporting allegations or suspicions of sexual abuse in compliance with Rhode Island's mandatory reporting statute, R.I. Gen. Laws § 40-11-3.

18.    Defendant St. Matthew's Church of Central Falls, now Holy Spirit Church, is a domestic non-profit corporation, incorporated in Rhode Island, and maintains its principal place of business at 1030 Dexter Street Central Falls, Rhode Island 02863.

19.    At all relevant times, St. Matthew's conducted business in Rhode Island.

20.    Fr. Lepire was an adult individual who, during all relevant times, resided in Rhode Island.

21.     References to any Defendant entity include the entity and its parent companies, subsidiaries, affiliates, predecessors, successors, agents, and assigns. In addition, an allegation that an entity engaged in an act, deed, or transaction means that the entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

22.     At all relevant times, Defendants acted by and through their respective agents, servants, and employees.

## JURISDICTION AND VENUE

23.     Defendants have purposely established significant contacts in the state of Rhode Island and have carried out, and continue to carry out substantial, continuous, and systematic business activities in Rhode Island.

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds the jurisdictional threshold, exclusive of costs, is between citizens of different states, and Defendants have sufficient contacts with Rhode Island such that the maintenance of the suit in this district does not offend traditional notions of fair play and substantial justice.

25.     Venue in the United States District Court for the District of Rhode Island is proper pursuant to 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this judicial district at the time of commencement of the action.

**THIS ACTION IS TIMELY**
**PURSUANT TO RHODE ISLAND GENERAL LAW § 9-1-51**

26.     Plaintiff's claims are timely pursuant to R.I. Gen. Laws § 9-1-51 and the 2026 Amendments because they arise out of criminal sexual abuse perpetrated against Plaintiff while he was a minor.

27.     Following the 2019 legislation and passing of R.I. General Law §9-1-51, survivors of childhood sexual abuse had 35 years after turning 18-years old or 7-years from date of discovery of injury to bring claims against their abusers.

28.     The 2026 Amendments created a two-year "Revival Window" opening July 1, 2026, and closing June 30, 2028, during which survivors of childhood sexual abuse may bring civil claims against institutions and supervisors that enabled or covered up such abuse, regardless of when the applicable statute of limitations otherwise expired. This Revival Window was intended to close the gap created by the 2019 Amendments.

29.     Plaintiff's claims fall within the Revival Window because they are asserted against DOP as a non-perpetrator institutional defendant whose supervisory personnel enabled, concealed, and otherwise failed to report the sexual abuse of Plaintiff, as further alleged herein. Plaintiff files this Complaint within the period prescribed by the Revival Window and expressly invokes its provisions to the extent any otherwise-applicable limitations period would bar these claims.

30.     Defendant is further equitably estopped from asserting any statute of limitations defense because Defendant's own affirmative acts of concealment—including the suppression of complaints, the transfer of accused clergy to avoid public disclosure, and the failure to report allegations to civil authorities—prevented Plaintiff from discovering the facts necessary to bring a timely claim. Defendant may not benefit from a limitations defense that its own misconduct caused Plaintiff to miss.

6

31.     In response to the Attorney General's Report, the Diocese of Providence, through its current Bishop Bruce Lewandowski, publicly acknowledged the Diocese's institutional failures. In a video statement released on March 4, 2026, Bishop Lewandowski stated: "[w]e know and understand that the effects of abuse even from many decades past can persist, as if the abuse occurred yesterday. The Church failed them. Their abusers betrayed their trust and robbed them of their innocence and, in some cases, destroyed their lives. Their faith in God and His Church has been shaken and even lost," and further apologized to victim-survivors "for the failures of Church personnel and others in past decades to protect them and keep them safe." This public acknowledgment by the Diocese's own current leadership confirms that the Diocese knew or should have known of the risk of harm to children within its institutions and failed to take adequate measures to protect them.

## FACTS COMMON TO ALL COUNTS

### A. DEFENDANTS KNEW OR SHOULD HAVE KNOWN ABOUT THE PREVALENCE OF CHILD SEX ABUSE IN CHURCH INSTITUTIONS.

32.     Rhode Island, despite its small size, is home to one of the largest Catholic populations per capita in the United States, with over 39% of residents self-identifying as Catholic.

33.     The Catholic Church is no stranger to allegations of sexual abuse against its institutions and its agents and/or employees.

34.     Even in the Church's infancy, there was significant discussion about the need to take care in weeding out priests that exhibited behaviors suggesting that they might pose a threat to children in the Church.

35.     Starting in the 1940's, Catholic leaders in the U.S. discussed and debated ways to identify and weed out clergy and potential clergy engaged in abuse and/or exhibiting behavior demonstrating a propensity to sexually abuse children.

36.     The United States Conference of Catholic Bishops knew about the problem of widespread sexual abuse of minors by priests, nuns and laypeople starting in the late 1940's, at the latest.

37.     Religious leaders and scholars such as Aquinas Richard Sipe, studied the link between celibacy and pedophilia and how that link related to the epidemic of child abuse. Researchers also examined other mental health issues linked to celibacy that also contributed to the growing problem of sexual abuse by priests.

38.     In 1971, the *Loyola Psychological Study of the Ministry and Life of the American Priest* was published. The study was chartered by the U.S. Bishops, and it revealed that a substantial percentage of priests sampled were 11 psychosexually immature, lonely, and/or sexually active after ordination

39.     In 1977, the United States Conference of Catholic Bishops opened a psychiatric hospital for troubled priests called the Saint Luke Institute Inc. ("St. Luke's") in Silver Spring, Maryland, supervised by the Archdiocese of Washington. St. Luke's was one of several centers for "troubled" and "fallen" priests. Although St. Luke's initially focused on substance abuse, it quickly became a premier psychiatric facility for priests that sexually assaulted minors.

40. In 1985, the Director of St. Luke's, along with Vatican Embassy canon lawyer Rev. Thomas Doyle and a prominent lawyer authored a confidential document for the U.S. Bishops that warned, in dire terms, of the problem of widespread sexual abuse of children in Catholic institutions and it outlined immediate reforms to protect children from abuse. The 92-page report was provided to every U.S. bishop and archbishop at their meeting 1985 meeting in Collegeville, MN. In December 1985, a copy of the manual was sent to each diocesan bishop in the United States through St. Luke Institute. The bishops ignored the report and removed Fr. Doyle from his post.

41. The DOP's use of out-of-state treatment centers to manage accused clergy was not a good-faith effort to protect children, but rather a deliberate mechanism to conceal abuse, neutralize complaints, and return predatory priests to active ministry. According to the Rhode Island Attorney General's Report, at least 21 Diocese of Providence priests with documented allegations of child sexual abuse were sent to church-affiliated treatment facilities, including the Servants of the Paraclete in Jemez Springs, New Mexico; the House of Affirmation in Whitinsville, Massachusetts; the Queen of the Clergy Villa in Escoheag, Rhode Island; the Saint Luke Institute in Silver Spring, Maryland; and the Saint John Vianney Center in Downingtown, Pennsylvania. These referrals were used as a cynical pretext to give the appearance of remedial action while avoiding disclosure to law enforcement, parishioners, and the public. The use of these "treatment centers" expanded greatly under the leadership of Bishop Louis Gelineau, 1971-1997.

42. The Rhode Island Attorney General's Report identified 119 separate instances in which the DOP failed to report abuse allegations to law enforcement.

43. A significant portion of these reports occurred during Bishop McVinney and Bishop Gelineau's tenures.

44. Reverand Louis E. Gelineau, sixth bishop of Providence (appointed 12/1971, consecrated 01/1972-1997), acted as the highest official representative of the Diocese of Providence for 25 years, serving as the top legislator, executive, and judge, either personally or through his agents.

45. Bishop Gelineau had sole authority to suspend, remove, laicize, or deny clergy access to children. Bishop Gelineau's documented knowledge of abuse allegations, and his failure to meaningfully respond to them, establishes that DOP had actual, repeated notice of the multitude of clergy who posed an ongoing danger to children.

46. The Rhode Island Attorney General's report demonstrates that the failure of DOP to report allegations of child sexual abuse to authorities was not oversight but internal policy and established practice. The report makes clear it was the DOP's explicit institutional practice to refuse to investigate allegations of abuse, return accused clergy to new parishes, cover up abuse and provide continued access to more children.

47. Defendants were aware that the problem of sexual abuse of children in the Church went far beyond Catholic priests and included abuse by teachers, employees, volunteers and others in almost every Catholic institution.

48. Defendants owed Plaintiff a duty to exercise reasonable care to protect him from harm while under Defendants' custody and control.

49. Defendants owned, operated, managed, maintained, and/or controlled the facility at which the abuse occurred, and the abuse was committed by actual and/or apparent agents, servants, and/or employees of Defendants.

50. Defendants had the power, ability, and authority to hire, train, supervise, and terminate chaplains, teachers, counselors, and others with positions of authority over children.

51.     Defendants held themselves out as competent and capable of serving in a position of trust, confidence, and authority over children.

52.     Defendants created and facilitated an environment in which Fr. Lepire could manipulate, groom, and abuse Plaintiff under the guise of religious and educational instruction.

53.     Because he was a minor, Plaintiff did not, and could not, consent to the abuse he suffered. Moreover, Fr. Lepire inflicted his abuse through coercion, intimidation, undue influence, and/or the threat of physical and emotional harm.

54.     Defendants had actual and/or constructive knowledge of Fr. Lepire's sexual abuse against children, either before they hired him, or after that employment or agency began.

**B.   DEFENDANTS KNEW FR. ROLAND LEPIRE WAS ABUSING CHILDREN PRIOR TO AND DURING HIS ABUSE OF PLAINTIFF.**

55.     Fr. Roland Lepire was ordained on August 23, 1975. Prior to and/or shortly after being ordained, Fr. Lepire was assigned at St. James Church in Manville.

56.     Upon information and belief, St. Matthews Church of Central Falls had actual or constructive notice of Fr. Lepire's sexual abuse of children.

57.     Fr. Lepire was assigned to St. Aloysius Church in Woonsocket Rhode Island from 1975 to 1979. He was then transferred to St. Mary Church in Cranston but took "Sick Leave" in the summer of 1980 and was placed at the Brothers of Jesus Crucified in Providence. Upon returning from his "Sick Leave," Fr. Lepire was assigned to St. Matthews Church in Central Falls.

58.     In a 1979 note from Auxiliary bishop Kenneth Angell reads that Fr. Lepire, who was then at St. Aloysius "be transferred at once" and "not be reassigned in the Woonsocket area." Auxiliary bishop Angell orders the recipient of the note to "take this up with the PPB" and "arrange a new assignment within the week (if possible)." Fr. Lepire was then placed at St. Mary's in Cranston.

11

59.    During his assignment at St. Matthews, Fr. Lepire openly engaged in behavior that could have raised concerns on the part of the Defendants.

60.    Fr. Lepire would lavish Plaintiff with attention and would frequently buy him gifts such as clothing, candy, and food.

61.    Fr. Lepire would also invite Plaintiff to his private quarters at the rectory.

62.    When Plaintiff visited the rectory, he was taken to Fr. Lepire's sleeping quarters, and Plaintiff was required to pass by clergymen.

63.    Fr. Lepire would take youths, including Plaintiff, to his mother's house, where the abuse would continue.

64.    Despite these concerning behaviors, Defendants made no investigations or reports about Fr. Lepire. Instead, they simply continued to provide Fr. Lepire access to Plaintiff and other children.

65.    Fr. Lepire appears on both the Diocese of Providence Credibly Accused Clergy List and the Rhode Island Attorney General's Report.

## C. FR. ROLAND LEPIRE ABUSED PLAINTIFF WHILE HE WAS A PARISHIONER AT ST. MATTHEW'S CHURCH OF CENTRAL FALLS.

66.    In approximately 1980 or 1981, Plaintiff began to attend mass at St. Matthews Church in Central Falls, Rhode Island. Plaintiff was drawn to the charitable and welcoming nature of the church and would frequently eat his lunch at the church after mass.

67.    As a member of the parish, Plaintiff would frequently go to the church to help Fr. Lepire and the Sisters with tasks before and after mass, including but not limited to setting up the pews or cleaning them.

68.    Fr. Lepire would lavish Plaintiff with gifts and attention, frequently buying him clothing, candy, and food.

69.    Approximately in 1980 or 1981, when Plaintiff was around 10 or 11-years old, he was sexually abused by Fr. Lepire, including but not limited to groping, fondling, molestation, and oral rape. These instances would occur at the rectory and Fr. Lepire's mother's house.

70.    The abuse was open and obvious, and was known amongst other members of the clergy, and particularly the children.

71.    During Plaintiff's abuse at the rectory under the hands of Fr. Lepire, the two were not alone. To get to Fr. Lepire's sleeping quarters, the two had to pass by an older male, described as wearing black clothing, who would be sitting at his desk and checking people in.

72.    Fr. Lepire would invite youths, including Plaintiff to his mother's house, where Fr. Lepire would abuse them. Fr. Lepire took advantage of Plaintiff's less fortunate situation and need for food and would entice Plaintiff with the promise of a homecooked meal.

73.    The abuse finally stopped when Plaintiff left the church and began attending another parish.

74.    Plaintiff's abuse, which was facilitated, enabled, and covered up by the Defendants, caused him to struggle throughout his life and Plaintiff has suffered physically, mentally, and emotionally for the past several decades. Defendants have caused him lifelong struggles in his education, career, and have caused him to experience sexual confusion.

75.    Having grown up in a Catholic community, Plaintiff grew up with the view that the Church and members of the clergy were morally good, but also authority figures. In fact, Plaintiff thought of the church as a sacred refuge until he met Fr. Lepire. The abuse by Fr. Lepire completely shattered Plaintiff's faith and robbed him of his innocence. Plaintiff's relationship with the church was never the same.

**CAUSES OF ACTION**

**COUNT I**
**Negligence**
**(All Defendants)**

76.     Plaintiff re-alleges and incorporates by reference the factual allegations contained in all prior paragraphs as if fully stated in this Count.

77.     Defendants owed Plaintiff a duty of reasonable care to protect him from injury because he was a child committed to their care and custody.

78.     Defendants owed Plaintiff a duty of reasonable care because they had a special relationship with him.

79.     Defendants also had a duty arising from the special relationship that existed with Plaintiff to properly train and supervise their representatives, agents, and employees.

80.     Defendants owed Plaintiff a duty to protect him from harm because Defendants were on notice of Fr. Lepire's history of abuse and were his employers and/or had authority over him.

81.     Defendants also had a duty to take reasonable steps to prevent Fr. Lepire from using his authority or the tasks, premises, and instrumentalities of his position to target and sexually abuse children generally, including Plaintiff.

82.     By establishing and/or operating as religious institutions and holding their facilities and programs out to be a safe environment for children like Plaintiff, Defendants owed Plaintiff a duty to properly supervise Plaintiff to prevent harm to him from foreseeable dangers.

83.     Defendants owed Plaintiff a duty to protect him from harm because they invited him onto their property, and Fr. Lepire posed a potentially dangerous condition on Defendants' property.

84.     In breach of the duties owed to Plaintiff, Defendants, among other things:

.a   failed to use ordinary care in determining whether their facilities were safe and/or determining whether they had sufficient information to represent their facilities as safe,

.b   failed to protect Plaintiff from a known or potential danger,

.c   failed to have sufficient policies and procedures in place to prevent child abuse and child sex abuse,

.d   failed to properly implement policies and procedures to prevent child abuse and child sex abuse,

.e   failed to take reasonable measures to ensure that policies and procedures to prevent child abuse and child sex abuse were effective,

.f   failed to adequately inform families and children of the risks of child abuse and child sex abuse,

.g   failed to investigate risks of child abuse and child sex abuse,

.h   failed to properly screen prospective employees for hire, and once hired, to train and supervise their employees,

.i   failed to fulfill their duty to report child abuse and child sex abuse to relevant authorities pursuant to R.I. Gen. L. § 40-11-3,

.j   failed to investigate suspected child abuse and child sex abuse,

.k   failed to dismiss employees, agents, and/or servants who were sexually abusing children in their care,

.l   failed to inform the parents of children who were sexually abused,

.m  failed to acknowledge to the children and to their parents or guardians that wrongs had been committed against them, that they were not to blame, to offer any medical care or mental health care to the abused students, or to offer just compensation for their injuries,

.n  failed to have any outside agency test their safety procedures,

.o  failed to protect the children under their care from child abuse and child sex abuse,

.p  failed to adhere to the applicable standard of care for child safety,

.q  failed to investigate the amount and type of information necessary to represent the Defendants and their programs, administration, and staff as safe,

.r  failed to train their representatives, agents, and employees properly to identify and report signs of child abuse and child sex abuse by fellow employees,

.s  failed to create and foster a culture of accountability and shared responsibility for the welfare of the children in their care, and

.t  failed to otherwise exercise ordinary and reasonable care to assure the safety of children in their care.

85.    Defendants also breached their duty to Plaintiff by failing to warn Plaintiff or his family about Fr. Lepire's history of child sexual abuse, and Defendants' knowledge of the same.

86.    The sexual abuse and resulting injuries to Plaintiff were caused solely and wholly by reason of the negligent failures of the Defendants.

87.    As a direct and proximate result of Defendants' negligence, Plaintiff was sexually abused and sustained emotional, physical, and psychological injuries as set forth with particularity, above.

16

88.    The physical and psychological harm suffered by Plaintiff as a direct and proximate result of Defendants' negligence resulted in economic damages in the form of the cost of counseling and other mental health treatment, and loss of earning capacity resulting from his trauma. Plaintiff's injuries were caused solely by Defendants' negligence, without any negligence by Plaintiff.

## COUNT II
## Negligent Hiring of Employees
### (All Defendants)

89.    Plaintiff re-alleges and incorporates by reference the factual allegations contained in all prior paragraphs as if fully stated in this Count.

90.    Defendants had actual or constructive knowledge, or should have known, and therefore it was reasonably foreseeable, that in the ordinary course of a priest's duties, a priest might present a threat of injury to minor parishioners.

91.    Defendants had actual or constructive knowledge, or should have known, that Fr. Lepire was a sexual offender and/or had propensities of pedophilia and/or hebephilia and/or ephebophilia and was unfit to perform his duties as a priest involving ministry to children and therefore posed a severe danger to such minors.

92.    Defendants owed Plaintiff a duty to use reasonable care in their vetting of Fr. Lepire, before hiring him, including without limitation, by performing a background check, mental health screenings, psychological evaluations, and in-depth review of references and prior work history with children and youth.

93.    In breach of that duty, Defendants failed to use reasonable care in their evaluation and selection of Fr. Lepire to serve in a position in which he would foreseeably come in contact with children. Defendants' hiring procedures were insufficient to ensure that Fr. Lepire was competent and fit for the work assigned to him, and that he would not cross professional or personal boundaries in performance of his duties.

94.    Had Defendants had in place appropriate pre-hiring diligence and investigative procedures, they would have discovered Fr. Lepire's unsuitability for employment by the Defendants and would not have retained him for his position, considering the information the investigation would have uncovered.

95.    Had Defendants performed appropriate pre-hiring diligence and investigation, they would have discovered Fr. Lepire's unsuitability for employment by the Defendants and would not have retained him for his position considering the information they knew, or should have known, of his history of abuse, including sexual abuse, of children.

96.    As a direct and proximate result of Defendants' negligence, Plaintiff was sexually abused and sustained emotional, physical, and psychological injuries as set forth with particularity, above.

97.    The physical and psychological harm suffered by Plaintiff as a direct and proximate result of Defendants' negligence resulted in economic damages in the form of the cost of counseling and other mental health treatment, and loss of earning capacity resulting from his trauma. Plaintiff's injuries were caused solely by Defendants' negligence, without any negligence by Plaintiff.

## COUNT III
### Negligent Supervision and Retention of Employees
#### (All Defendants)

98.     Plaintiff re-alleges and incorporates by reference the factual allegations contained in all prior paragraphs as if fully stated in this Count.

99.     At all times, Fr. Lepire was employed by Defendants and was under their direct supervision, employ, and control when he committed the wrongful acts herein.

100.     Defendants had actual or constructive knowledge, or should have known, that Fr. Lepire was a sexual offender and/or had propensities of pedophilia and/or hebephilia and/or ephebophilia and was unfit to perform his duties as a priest involving ministry to children and therefore posed a severe danger to such minors.

101.     Defendants owed Plaintiff a duty supervise and retain, assign, or transfer only those employees who were suitable for the position for which they were hired, and specifically had a duty to retain, assign, or transfer Fr. Lepire only if he acted in a professional and appropriate manner towards children.

102.     In breach of that duty, Defendants failed to monitor Fr. Lepire's conduct and performance of his duties, unlawfully retained him in their employ, and failed to take appropriate action to ensure that children, such as Plaintiff, were not further harmed by Fr. Lepire, despite Defendants' actual or constructive notice of Fr. Lepire's sexual conduct towards children.

103.     Defendants further breached their duty by failing to report known or suspected child abuse in violation of Rhode Island's mandatory reporting statute, R.I. Gen. L. § 40-11-3.

104.    Had Defendants had in place appropriate post-hiring investigation, supervision, and retention procedures, they would have discovered Fr. Lepire's unsuitability for employment by the Defendants and would not have unlawfully retained him in their employ, in light of Defendants' actual or constructive notice of Fr. Lepire's sexual conduct towards children.

105.    Had Defendants appropriately supervised Fr. Lepire, they would have discovered Fr. Lepire's unsuitability for employment by the Defendants and would not have retained him for his position in light of Defendants' actual or constructive notice of Fr. Lepire's sexual conduct towards children.

106.    As a direct and proximate result of Defendants' negligence, Plaintiff was sexually abused and sustained emotional, physical, and psychological injuries as set forth with particularity, above.

107.    The physical and psychological harm suffered by Plaintiff as a direct and proximate result of Defendants' negligence resulted in economic damages in the form of the cost of counseling and other mental health treatment, and loss of earning capacity resulting from his trauma. Plaintiff's injuries were caused solely by Defendants' negligence, without any negligence by Plaintiff.

## COUNT IV
## Premises Liability
### (All Defendants)

108.    Plaintiff re-alleges and incorporates by reference the factual allegations contained in all prior paragraphs as if fully stated in this Count.

109.    Defendants owed the highest duty to Plaintiff, a minor and invitee to their business, to provide safe premises, free of the risk of harm and/or injury by the Defendants' representatives, employees, and/or agents.

20

110.    Defendants had a duty to eliminate dangerous conditions on their premises, of which they were or should have been aware.

111.    In breach of their duty to Plaintiff, Defendants negligently failed to provide safe premises, free of the risk of harm or injury. Defendants had ample notice and opportunity to ensure the safety of children whose care they were entrusted, including Plaintiff, from being victims of harassment, sexual abuse, and battery.

112.    As a direct and proximate result of Defendants negligently failing to maintain a safe premises, and to otherwise protect Plaintiff from harm, Plaintiff was harassed and sexually exploited, abused, and battered on the premises of the Defendants.

113.    As a direct and proximate result of Defendants' negligence, Plaintiff was sexually abused and sustained emotional, physical, and psychological injuries as set forth with particularity, above.

114.    The physical and psychological harm suffered by Plaintiff as a direct and proximate result of Defendants' negligence resulted in economic damages in the form of the cost of counseling and other mental health treatment, and loss of earning capacity resulting from his trauma. Plaintiff's injuries were caused solely by Defendants' negligence, without any negligence by Plaintiff.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully prays that this Court grant him the following:

A.    Award Plaintiff economic and non-economic compensatory damages in an amount in excess of seventy-five thousand dollars ($75,000), the exact amount will be established at trial:

B.    Award punitive damages to the extent allowed by law;

C.    Award Plaintiff all pre-judgment and post-judgment interest allowed by law;

D.      Award Plaintiff reasonable costs and fees; and

E.      Award Plaintiff any other such relief this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby respectfully demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

**HERMAN LAW GROUP**

*/s/ Louise A. Herman*
 Louise A. Herman, Esq. (#6430)
1445 Wampanoag Trail, Suite 104
E. Providence, RI 02915
(401) 277-4110
(401) 433-0139 (fax)
Email: lherman@lhermanlaw.com

**GRANT & EISENHOFER**

*/s/ Elizabeth Graham*
Elizabeth Graham, Esq.
(*Pro Hac Vice Forthcoming*)

*/s/ Steven J. Kelly*
Steven J. Kelly, Esq.
(*Pro Hac Vice Forthcoming*)

*/s/ Garrett Gittler*
Garrett Gittler, Esq.
(*Pro Hac Vice Forthcoming*)
123 Justison Street
Wilmington, DE 19081
Phone: (410) 204-4528
Fax: (302) 622-7001
egraham@gelaw.com
skelly@gelaw.com
ggittler@gelaw.com

Dated: July 1, 2026